| | |
|---|---|
| RODNEY RILEY, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   No. 3:25-cv-00036 |
| | ) |
| PHOENIX COMMUNITY CAPITAL, | ) |
| | ) |
| et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM OPINION**

## I.      Introduction

Twenty-six individuals ("Plaintiffs")[1] bring this case alleging putative violations of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78a et seq., ("Exchange Act") and corresponding 17 C.F.R 240.10b-5, the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §§ 1961 et seq., ("RICO"), as well as common law tort claims of fraud and deceit and conversion.   They sue Phoenix Community Capital ("PCC"), XETA Capital, LLC ("Xeta"), Matthew Sgherzi, Gavin Minty, Eric Marshall, and Daniel Ianello ("Defendants").[2] To date, the only individual defendants to be served are Minty, Sgherzi, and Ianello, (Doc. No. 63), who have

---

[1] Plaintiffs are Rodney Riley, Daniel Megibben, Thomas Spence, John Sauter, Jennifer Sue Martin, Nicholas Sgherzi, Calum Courtney-Harris, Jorge Delgado, Luis Palacio, Matthew Greentree, Michael Elkhoen, Daniel Quintana, Jeffrey Paul Martin, Darren Horner, Ross Keeley, Michael Citro, Andres Carneiro, Solange Picorelli, Jordan Branaugh, Tomas Zatloukal, Alif Ahamed, German Berlasso, Charlie Cowley, Christopher Wilson, Chandler Whitbord, Vincent Ocaima, and Guillermo Villa-Valdes.

[2] The Court will refer to individual parties by their last names (any references to "Sgherzi" are to Defendant Sgerzhi, not Plaintiff Sgherzi).

each moved to dismiss. (Doc. Nos. 51 and 55). Those motions are ripe for decision and will be granted.

## II.      Factual Allegations[3]

The First Amended Complaint ("Complaint") starts with a splash, with Plaintiffs stating:

> This case concerns a massive cryptocurrency fraud involving tens of millions of dollars. Investors were lured into investing in this scheme by false promises regarding returns, transparency, and the legitimacy of the enterprises. The schemes utilized pretentious and misleading language to create false impressions of legitimacy. The Defendants made false and misleading statements to obscure and conceal the fraud and the rights of Plaintiff to bring suit.
>
> * * *
>
> The Defendants have engaged in fraudulent practices and have employed schemes and artifices to defraud Plaintiffs. The fraud and deceit of which they are guilty arise from the sales and exchange in interstate and foreign commerce of unregistered securities, through interstate wire transactions, of chronic misrepresentations of material facts, and otherwise of securities in the context of cryptocurrency schemes.

At the center of these fraudulent schemes are "tokens" sold in various forms. (Doc. No. 45 at 1 and 2). Each of the 26 Plaintiffs represent that they have purchased "tokens or accumulations of tokens" based upon "false and fraudulent information." (Doc. No. 45 at 3). Of the 26 Plaintiffs, only two Tennessee residents, Elija Megibben and Thomas Chandler Spence, make specific allegations of their experiences with Defendants.

Through Internet social media channels and community forums, Defendants communicated with investors like Megibben and Spence. (Doc. No. 45 at 7). There are only two other allegations specifically related to Spence. One avers that Sgherzi "personally" reached out to Spence in Tennessee "for investment." (Doc. No. 45 at 5). The second is that Minty, the PCC

---

[3] The Court relies upon the factual allegations in the Complaint, assumes the truth of those allegations, and construes them and reasonable inferences from them in the plaintiffs' favor for purposes of ruling on the motions to dismiss. See, e.g., Erickson v. Pardus, 551 U.S. 89, 94 (2007).

2

Chief Operating Officer ("COO"), "published updates to investors," including Megibben and Spence. (Id. at 7).

Megibben's allegations center around his fraud claims against Defendants. This resulted in Sgherzi filing a defamation lawsuit in Tennessee against Megibben. (Id. at 9). After the lawsuit was dismissed, Minty and Sgherzi continued a "campaign of insults and lies in an attempt to intimidate Megibben into silence." (Id.). Madding King, on behalf of Defendants, then contacted Megibben to "discourage" him from bringing a lawsuit, presumably against Defendants. (Id.). King "would oversee" PCC's investments and update investors on "professionalism and legal compliance of PCC." (Id. at 8).

In his declaration[4] to support personal jurisdiction over Defendants, Megibben expands on his dealings with Sgherzi and Minty, specifically, and "others" generally. He shares that upon discovering "multiple irregularities and outright lies," (Doc. No. 67-1 at 1), Defendants targeted him to prevent others from "discovering their deceit." (Id. at 2). Then, starting in May or June 2022 through December 2023, Megibben itemizes his contacts with Defendants and their agent King:

- January – June 2022 – Sgherzi, Minty, and others attacked him for criticizing the management and operation of PCC and Xeta (id. at 1–2);

- June 2022, March and June 2024 – King contacted him in Tennessee to discuss PCC and Xeta (id. at 2, 4);

- April 2023 – November 2023 – Minty, Sgherzi, and Marshall made Internet postings and other communications about Megibben and his family to publicly embarrass and harass him (id. at 2–4);

- April 2023 – He received a "cease and desist" letter from Xeta Capital because of his public disclosure of Defendants' fraud (id. at 3);

- August 2023 – He was served with a lawsuit for defamation by Sgherzi, which would ultimately be dismissed (id. at 3);

---

[4] The Court can consider Megibben's declaration solely as it relates to the issue of personal jurisdiction. See Malone v. Stanley Black & Decker, Inc., 965 F.3d 499, 505 (6th Cir. 2020).

- He received communication from Ianello that he was CEO of PCC and other routine communications (id. at 4);
- March 2023 – Ianello converts crypto to "fiat," promises investors "returns" (id. at 5); and

- November 2024 – Ianello liquidates investor funds to his own accounts and confirms asset purchase of PCC (id. at 5–6).

There are allegations in the Complaint about investors generally that could pertain to all 26 Plaintiffs. These include:

- Ianello's actions in his role as CEO of PCC, his receipt of money, his stated belief that investments would yield profits, his statements regarding his non-disclosure agreement, and his update in November 2024 regarding sales of Combat Waffle. (Doc. No. 45 at 10–11).
- Marshall, Sullivan, Minty, and Sgherzi's representations that sales of their token "$Fire" would be used to invest in "actual companies or start-ups." (id. at 12).
- Representations to investors (id. at 13), including:
  - PCC was negotiating with Netflix to produce a movie;
  - PCC was negotiating with Thailand's government regarding licensure opportunities;
  - PCC was creating a resort and luxury hotel;
  - PCC was working on getting favorable reports on PCC published by Bloomberg and Yahoo Finance; and
  - PCC had the support of the All-Party Parliamentary Group in London.
- May 2022 - several PCC principals create Xeta Capital, which issued "$Xeta" tokens; Xeta Capital partnered with Swiss wealth management firm Gaxsys (id. at 15).
- Multiple iterations of Xeta Capital ("Xeta entities") were created: first Xeta Blue, then Xeta Black, and finally Xeta Genesis (id. at 15, 18).

The factual portion of the Complaint concludes with a list of allegations under the heading "Schemes." (Doc. No. 45 at 20). Plaintiffs allege that the "schemes and artifices to defraud Plaintiffs were made by internet interstate wire transmissions." (Id.). These included: fraudulent statements about Daniel Kingsley, a financial consultant; fraudulent materials created by Xeta

4

Capital and Gaxsys Holding; and fraudulent statements that Equiti, a brokerage firm in the Kingdom of Jordan, was affiliated with Defendants, among others. (Id. at 20–21).

III.     **Plaintiffs' Legal Claims**

The 26 Plaintiffs allege violations of the federal securities and RICO laws as well as state tort claims.

On their securities claim they allege that they contributed money to PCC and the various Xeta entities based upon numerous false representations, specifically:

a) That Phoenix Community Capital and the Xeta entities were legitimate investment organizations, rather than fraudulent enterprises;

b) That Phoenix Community Capital was engaged in negotiations with Netflix to produce a movie or television Series;

c) That Phoenix Community Capital was engaged in negotiations with the government of Thailand regarding licensure of their cryptocurrency investment opportunities and to compete with banks;

d) That Phoenix Community Capital was engaged in the development of a resort and luxury hotel as part of its global investment portfolio;

e) That Phoenix Community Capital was working with Bloomberg and Yahoo Finance to publish favorable information about the fund and its alleged investment potential and projects;

f) That Phoenix Community Capital was sponsored by the "All-Party Parliamentary Group" in London and was to be recognized at an award ceremony at the House of Lords;

g) Xeta Capital was to make quarterly accounting reports available to investors;

h) That Xeta Blue investments would garner a 265% return on investment;

i) That Xeta Capital's alleged partner, Gaxsys, was a company which had grossed over $100 billion since its inception and currently managed $6 billion in assets;

j) That Xeta Capital investors would receive quarterly audits by Price Waterhouse and KPMG;

k) That Xeta Capital was earning a 2.5% daily return on investment, and

l) That Gaxsys had a sizable global real estate portfolio.

(Doc. No. 45 at 22–23).

On the RICO claim, Plaintiffs make conclusory allegations that Defendants engaged in a pattern of racketeering activity, engaged in an enterprise, engaged in at least two racketeering predicate acts, and Defendants' conduct led to Plaintiffs' investment. (Id. at 23–24). With respect to the required predicate acts for RICO liability, Plaintiffs allege, *inter alia*, that Defendants used "knowingly" false representations regarding the legitimacy of their investment enterprise to induce" Plaintiffs to invest. (Doc. No. 45 at 25).

On the state tort claims, Plaintiffs rely again on Defendants alleged false representations. For fraud and deceit, Plaintiffs allege that they relied on those representations to invest in the fraudulent entities, causing them damage. (Id.) Similarly, on the conversion claim the false representations caused the Plaintiffs to invest funds that Defendants used for their own benefit. (Id. at 26).

## IV.    12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction

Ianello argues that dismissal is required because he is domiciled in Michigan and Plaintiffs do not allege that he has had any contacts with Tennessee or that their claims arise out of such contacts, so the Court does not have personal jurisdiction over him. (Doc. No. 51 at 1–2). Sgherzi and Minty also argue that Plaintiffs' claims must be dismissed for lack of personal jurisdiction. (Doc. No. 55 at 1–2). Plaintiffs disagree. (Doc. No. 67 at 2–8).

### A. Legal Standard

"The party seeking to assert personal jurisdiction bears the burden of demonstrating that such jurisdiction exists." Schneider v. Hardesty, 669 F.3d 693, 697 (6th Cir. 2012) (citation and quotation marks omitted). "[T]he weight of [the] burden . . . depends on whether the [C]ourt

6

chooses to rule on written submissions or to hear evidence on the personal-jurisdiction issue." Id. (citation and quotation marks omitted). "If the court holds an evidentiary hearing and the defendant's [12(b)(2)] motion is properly supported with evidence, the plaintiff must overcome it by a preponderance of the evidence." Malone, 965 F.3d at 505. In contrast, if the Court decides a 12(b)(2) motion to dismiss "on written submissions alone," the plaintiff has a "relatively slight" burden of making a prima facie showing of personal jurisdiction. Id. (citations and quotation marks omitted). The plaintiff meets this burden by "establishing with reasonable particularity sufficient contacts between [the defendants] and the forum state to support jurisdiction." Neogen Corp. v. Neo Gen Screening, Inc., 282 F.3d 883, 887 (6th Cir. 2002) (citation and quotation marks omitted). In deciding whether the plaintiff meets this burden, the Court "will not consider facts proffered by the defendant[s] that conflict with those offered by the plaintiff[s], and will construe the facts in the light most favorable to the nonmoving party." Id. (citation and quotation marks omitted); see also AlixPartners, LLP v. Brewington, 836 F.3d 543, 549 (6th Cir. 2016) (citation and quotation marks omitted) ("[T]he pleadings and affidavits submitted must be viewed in a light most favorable to the plaintiff, and the [C]ourt should not weigh the controverting assertions of the party seeking dismissal.").

**B. Analysis**

Plaintiffs sufficiently plead personal jurisdiction with respect to their claims arising under the Exchange Act, which expressly vests the Court with personal jurisdiction over Defendants on the securities fraud claims.[5] Med. Mut. of Ohio v. deSoto, 245 F.3d 561, 567 (6th Cir. 2001) (quoting United Liberty Life Insurance Co. v. Ryan, 985 F.2d 1320 (6th Cir. 1993)) ("[T]he national service of process provision contained in § 78aa of the Securities Exchange Act of 1934

---

[5] Sgherzi and Minty concede this issue. (Doc. No. 56 at 1).

'confer[s] personal jurisdiction in any federal district court over any defendant with minimum contacts to the United States.'"). Therefore, the Court's personal jurisdiction analysis will focus on Plaintiffs' RICO claims.[6]

### i. General Principles of Personal Jurisdiction

There are two types of personal jurisdiction: general and specific. Intera Corp. v. Henderson, 428 F.3d 605, 615 (6th Cir. 2005). The Court has general jurisdiction "when a defendant's contacts with the forum state are of such a continuous and systematic nature that the state may exercise personal jurisdiction over the defendant even if the action is unrelated to the defendant's contacts with the state." Id. (citations and quotation marks omitted). Plaintiffs do not argue that general jurisdiction exists in this case. Nor could Plaintiffs establish that the Court has general jurisdiction, because they do not allege that Ianello, Sgherzi, or Minty have systematic and continuous contacts with Tennessee. Therefore, only specific jurisdiction is at issue. Specific jurisdiction exists "where the claims in the case arise from or are related to the defendant's contacts with the forum state." Id. (citation omitted).

When, as here, the Court's "subject-matter jurisdiction is based on a federal question," the exercise of specific personal jurisdiction "must be both authorized by the forum State's long-arm statute and in accordance with the Due Process Clause of the Fourteenth Amendment." AlixPartners, LLP v. Brewington, 836 F.3d 543, 549 (6th Cir. 2016) (citations omitted). "Tennessee's long-arm statute [Tennessee Code Annotated Section 20-2-214] has been interpreted to be coterminous with the limits on personal jurisdiction imposed by the Due Process Clause of the United States Constitution, and thus, the jurisdictional limits of Tennessee law and of federal

---

[6] The Court disposes of the state law claims on separate grounds. See infra Section VI.

constitutional law of due process are identical." Henderson, 428 F.3d at 616 (citations and quotation marks omitted).

"Due Process requires the defendant to have sufficient 'minimum contacts with [the forum State] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" Concord Music Grp., Inc. v. Anthropic PBC, 738 F. Supp. 3d 973, 981 (M.D. Tenn. 2024) (quoting International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). "'Minimum contacts' exist when the nonresident's 'conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" Id. (citations omitted). Additionally, the "minimum contacts analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." Walden v. Fiore, 571 U.S. 277, 285 (2014).

The Sixth Circuit uses a three-part test, initially applied in Southern Machine Company v. Mohasco Industries, Inc., 401 F.2d 374, 381 (6th Cir. 1968), to determine if specific jurisdiction exists and if exercise of personal jurisdiction satisfies due process:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

Henderson, 428 F.3d at 615. "[W]hen the first two elements are met, an inference arises that the third, fairness, is also present; only the unusual case will not meet this third criterion." Am. Greetings Corp. v. Cohn, 839 F.2d 1164, 1170 (6th Cir. 1988) (citation omitted).

*ii. Personal Jurisdiction under RICO*

RICO contains a specific jurisdictional provision, as the Sixth Circuit has explained:

[Section] 1965(a) provides for *venue*, not jurisdiction. Because subsection (a) is not jurisdictional, another rule—such as Federal Rule of Civil Procedure 4(k)(1)(A)

9

and the relevant state's long-arm statute—is required to establish personal jurisdiction over an initial defendant. Then, § 1965(b) extends personal jurisdiction through nationwide service of process over "other parties residing in any other district," as long as venue is proper through (a) with that initial defendant and the "ends of justice" require it.

Peters Broad. Eng'g, Inc. v. 24 Cap., LLC, 40 F.4th 432, 441 (6th Cir. 2022).

Here, analysis of personal jurisdiction in RICO involves two steps. First, the Court must address whether at least one defendant has "traditional forum state contacts (the defendant described by § 1965(a) and reached by Rule 4(k)(1)(A)) such that any number of defendants from other districts may be joined under § 1965(b)." Peters Broad. Eng'g, Inc., 40 F.4th at 441. This requires application of the three-part Mohasco test. See id. Second, the Court must address whether exercising jurisdiction is required by the "ends of justice."[7] Id.

*iii. Application of the Mohasco Factors to this Case*

With those principles in mind, the Court will address each Mohasco factor.

a. Purposeful Availment

The first factor in the three-part test, "'purposeful availment[,]' is "the constitutional touchstone of personal jurisdiction." Brewington, 836 F.3d at 549 (citation omitted). "[P]urposeful availment is something akin to a deliberate undertaking to do or cause an act or thing to be done in [the forum state] or conduct which can be properly regarded as a prime generating cause of the effects resulting in [the forum state], something more than a passive availment of [forum state] opportunities." Neogen Corp., 282 F.3d at 891 (citation and quotation marks omitted). This requirement is not met when a nonresident only has "random, fortuitous, or attenuated contacts" with the forum state, or his contacts result from "the unilateral activity of

_____

[7] As explained below, the Court does not reach the "ends of justice" inquiry in this case.

another party or a third person[.]" <u>Brewington</u>, 836 F.3d at 550 (citation and quotation marks omitted).

Purposeful availment is satisfied, however, when "a nonresident [] deliberately engages in 'significant activities within a State' or creates 'continuing obligations between himself and residents of the forum.'" <u>Id.</u> (citation omitted). Similarly, a nonresident seeking to further his business in the forum state is relevant to the purposeful availment analysis. <u>See</u> <u>Rice v. Karsch</u>, 154 F. App'x 454, 463 (6th Cir. 2005) (citation omitted). "And although physical presence in the forum is not a prerequisite to jurisdiction, physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact." <u>Walden</u>, 571 U.S. at 285 (citation omitted); <u>see also</u> <u>Serras v. First Tennessee Bank Nat. Ass'n</u>, 875 F.2d 1212, 1217 (6th Cir. 1989) (explaining this factor was met where "the plaintiffs rel[ied] not only on alleged telephone calls but also on an allegation that the defendant actually travelled to Michigan to solicit their business, and actually made fraudulent representations while in Michigan.").

Further, communications by the nonresident to the forum state "may be sufficient to confer jurisdiction on the foreign defendant" when they form the basis for the cause of action. <u>Neal v. Janssen</u>, 270 F.3d 328, 332 (6th Cir. 2001). For example, in <u>Neal v. Janssen</u>, 270 F.3d 328, 332 (6th Cir. 2001), the "plaintiffs contend[ed] that [the defendant] intentionally defrauded them in phone calls and faxes directed to [them] or their agents in Tennessee." The court explained, "[w]hen the actual content of the communications into the forum gives rise to an intentional tort action, that alone may constitute purposeful availment. It is the quality of the contacts, not the quantity, that determines whether they constitute "purposeful availment.'" <u>Id.</u> It is important here that the court added: "Furthermore, the actions of sending false information into Tennessee by

11

phone and fax had foreseeable effects in Tennessee and were directed at individuals in Tennessee. These false representations are the heart of the lawsuit—they were not merely incidental communications sent by the defendant into Tennessee." Id.

Here, Plaintiffs sufficiently allege that Sgherzi, Minty, and Ianello purposefully availed themselves of contacts with Tennessee. First, they specifically claim that Sgherzi did so by: (1) "personally reaching out to [] Spence for investment" (Doc. No. 45 at 5); (2) suing Megibben in Tennessee for publication of complaints that are connected to accusations in this case (id.); (3) conducting business in Tennessee, including making fraudulent statements that led to loss of Plaintiffs' money (id. at 5–6); (4) generally communicating with investors, including those in Tennessee (Doc. No. 45 at 7); (5) holding the title of PCC's Chief Marketing Officer ("CMO") when Megibben purchased tokens from PCC (Doc. No. 67-1 at 1); and (6) along with Minty, attacking Megibben through the Internet and messaging platforms, both while Megibben was in Tennessee and through communications directed at other Tennessee investors, both before and after Sgherzi filed his Tennessee defamation suit (Doc. No. 67-1 at 2–4).

Plaintiffs' specific claims regarding Minty's contacts with Tennessee are that he: (1) harassed Megibben (Doc. No. 45 at 8–9; Doc. No. 67-1 at 2–4); and (2) published updates to PCC investors, including Spence and Megibben in Tennessee, in his capacity as COO (Doc. No. 45 at 7, 16). With respect to Ianello, Plaintiffs argue he availed himself of the privilege of doing business in Tennessee by: (1) communicating directly with and making representations to investors in Tennessee, including Megibben (id. at 5–6; Doc. No. 67-1 at 4–6); (2) controlling communications between PCC and investors (Doc. No. 45 at 5–6, 10); (3) "sending false financial documents to the plaintiffs in Tennessee" (id. at 5); (4) "rescinding obligations to PCC investors, including those

12

in Tennessee" (Doc. No. 67-1 at 5); and (5) moving Tennessee investors' money and preventing them from being able to access it (id. at 5–6).

Lastly, Plaintiffs allege that Defendants communicated to Tennessee investors and established contact with Tennessee through their agent, King. Plaintiffs assert that King resides in Nashville, oversaw PCC investments and the various Xeta entities investments (including moving money out of Tennessee), received compensation from PCC in Tennessee, had regular communication with at least Ianello and Sgherzi, introduced Ianello to PCC, had multiple direct communications with Megibben, and was an intermediary between plaintiffs in Tennessee and Defendants. (Doc. No. 45 at 5–10; Doc. No. 67-1 at 2, 4–5).

Collectively, these allegations demonstrate that Sgherzi, Minty, and Ianello deliberately undertook to "do or cause an act or thing to be done in" Tennessee, which created continuing obligations between themselves and residents of Tennessee. Neogen Corp, 282 F.3d at 891; Brewington, 836 F.3d at 550. They also show that Sgherzi, Minty, and Ianello sought to further their business in Tennessee and contacted investors in Tennessee not merely by virtue of the investors choosing to reside in Tennessee, but also by using a Tennessee resident, King, as their agent to conduct business in Tennessee. See Walden, 571 U.S. at 285; Rice, 154 F. App'x at 463. Finally, because communications by Sgherzi, Minty, and Ianello, including those made into and directed at Tennessee, form the basis for the suit, those can be sufficient to establish purposeful availment. Neal, 270 F.3d at 332. If the only contact with Tennessee was Sgherzi filing suit against Megibben, which was *after*[8] at least the initial alleged fraud forming the basis of this case,

---

[8] The Court notes, however, that some of Defendants' alleged contacts with Tennessee occurred after Sgherzi filed his defamation suit, as did some of the alleged harms Plaintiffs suffered. For example, Megibben claims that King contacted him on behalf of PCC and Xeta in March and June 2024 (Doc. No. 67-1 at 4), and that Ianello liquidated investors' funds in November 2024 (id. at 5).

13

that may have been insufficient to establish purposeful availment.  Cf. Rice, 154 F. App'x at 462 (emphasis added) ("[T]he Courts finds that actions taken or communications sent by a defendant *after* the filing of a Complaint . . . should not, as a matter of law, be considered when determining whether the Defendant had 'purposefully availed' himself of the privilege of acting on said jurisdiction.").  But Plaintiffs allege more than that and, taking the pleadings and Megibben's declaration in the light most favorable to them at this stage, the Court finds they have met their burden of satisfying the first Mohasco prong.

 b. Relatedness

The second Mohasco factor, "the 'arising from' requirement[,] is satisfied if the cause of action is 'related to' or 'connected with' the defendant's forum contacts."  Youn v. Track, Inc., 324 F.3d 409, 419 (6th Cir. 2003) (citations and quotation marks omitted).  Each claim must arise out of the forum contacts.  See Canaday v. Anthem Companies, Inc., 9 F.4th 392, 400 (6th Cir. 2021)  (quoting Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty., 137 S. Ct. 1773, 1781 (2017)) ("'What is needed' for a court to exercise specific personal jurisdiction 'is a connection between the forum and the specific claims at issue.'").

The only Plaintiffs that the Complaint makes specific mention of are Megibben and Spence.  The Court cannot conclude that plaintiffs other than Megibben and Spence have met their burden to show that their specific RICO claims are connected to or arise out of Sgherzi, Minty, and Ianello's contacts with Tennessee.  See id.  As a result, all of Plaintiffs' RICO claims, except for Megibben and Spence's, must be conclusively dismissed for lack of personal jurisdiction, and the Court "is powerless to proceed to an adjudication" on their merits.  Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 584 (1999) (citation and quotation marks omitted).

Megibben and Spence's RICO claims are a close call.  The Complaint only mentions Spence three times, averring that Sgherzi personally reached out to him for investment, Defendants intentionally directed communications toward him, and Minty "published updates to investors," including him.  (Doc. No. 45 at 5, 7).  Given this scarcity of detail, it is doubtful that Spence has met his burden of showing that his RICO claim arises out of those contacts.  Cf. Cabinets to Go, LLC v. Qingdao Haiyan Real Est. Grp. Co., LTD, 605 F. Supp. 3d 1051, 1062 (M.D. Tenn. 2022) (citation omitted) ("These allegations hint at a connection between [one of the defendants], Tennessee, and the present litigation. But they are too vague, speculative, and sparse to show personal jurisdiction or require jurisdictional discovery.").  Nevertheless, "[c]onstruing the facts in the light most favorable to [Spence], as we must for the purposes of this [motion to dismiss], it is possible that [Sgherzi, Minty, and Ianello's] activities in [Tennessee] have caused [] injury to [Spence]." Neogen Corp, 282 F.3d at 892.  If so, "[s]uch a causal connection satisfies the 'arising from' requirement of Mohasco." Id.

Megibben makes the most detailed allegations, including his declaration.  For example, he says that while he was in Tennessee, he purchased unregistered securities from PCC while Sgherzi was representing PCC.  (Doc. No. 67-1 at 1).  He states he was contacted multiple times by King on behalf of PCC and Xeta.  (Id. at 2, 4).  He also believes that Ianello essentially lied to Tennessee investors and stole their money, (id. at 5–6), (and it is reasonable to infer that Megibben was among those Tennessee investors).  Further, while Megibben could have been more precise in his pleadings, his RICO claim plainly arises out of his purchase of PCC tokens and other dealings with PCC, Xeta, and the people who ran those entities (Sgherzi, Ianello, and Minty).  (See, e.g., Doc. No. 45 at 24, alleging that plaintiffs were fraudulently induced to invest their money "with the Defendants' entities").  On the other hand, many of Megibben's allegations involve harm he

15

suffered from statements Sgherzi and Minty made about him and their harassment of him. (See, e.g., Doc. No. 67-1 at 2–4). However, he is not suing Defendants for defamation or other similar torts. It is doubtful that his RICO claim arises out of the harassing contacts he received from Sgherzi and Minty. Nevertheless, as with Spence, if the Court construes the pleadings in the light most favorable to Megibben, as it is required to on the motion to dismiss, he arguably satisfies the second Mohasco factor. See Neogen Corp, 282 F.3d at 892.

    c. Reasonableness

Having determined that Megibben and Spence tenuously satisfy the first two Mohasco factors, the inference is that it would be reasonable to exercise jurisdiction. See Cohn, 839 F.2d at 1170. This third prong "mandates that the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." Henderson, 428 F.3d at 618 (citation and quotation marks omitted). In assessing the third Mohasco factor, "the court should consider, among others, the following factors: (1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the policy." Schneider, 669 F.3d at 703–04 (citations and quotation marks omitted).

While Minty, Sgherzi, and Ianello would be burdened by having to defend this action in Tennessee, the Sixth Circuit "ha[s] deemed specific jurisdiction to be proper even when a defendant would be compelled to travel." Henderson, 428 F.3d at 618 (citation omitted). Additionally, though Sgherzi's defamation suit was filed after Megibben and Spence incurred at least the initial alleged harms in this case, he has nevertheless demonstrated a willingness to travel to Tennessee on matters related to this case, which makes any argument that travel would burden him less compelling. Further, Tennessee has an interest in protecting its residents from fraudulent

activity, and Megibben and Spence have an obvious interest in obtaining relief. <u>See</u> <u>id.</u> Lastly, other states may have an interest in this case, including Ianello, Sgherzi, and Minty's domiciles (Michigan, California, and Texas, respectively). But the Court does not have any information that any of the conduct in this case specifically occurred in those states. Therefore, to the extent that Spence and Megibben satisfy the first two <u>Mohasco</u> prongs, the Court will not disturb the inference that the third prong is met.

Because the Court has decided that the <u>Mohasco</u> factors are sufficiently satisfied for each of Megibben and Spence's RICO claims against Minty, Sgherzi, and Ianello, it need not analyze whether the "ends of justice" require exercising jurisdiction under RICO. <u>See</u> <u>Peters Broad. Eng'g, Inc.</u>, 40 F.4th at 441 (explaining the "ends of justice" analysis applies when using the nationwide service provision in § 1965(b) to extend personal jurisdiction because only one defendant has traditional forum state contacts).

## V.      <u>12(b)(6) Motion to Dismiss for Failure to State a Claim</u>

Even if the Court has personal jurisdiction over Sgherzi, Minty, and Ianello with respect to Megibben and Spence's RICO claims, those claims fail because they do not meet the heightened pleading requirements. All of Plaintiffs' securities fraud claims also fail for the same reason.

### A. Legal Standards

*i. Rule 12(b)(6) Pleading Requirements*

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Cooperrider v. Woods</u>, 127 F.4th 1019, 1027 (6th Cir. 2025) (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). When assessing a Rule 12(b)(6) motion to dismiss, the Court must accept the complaint's well-pleaded factual allegations as true, draw all reasonable inferences in the plaintiff's favor, and "take all of those facts and

17

inferences and determine whether they plausibly give rise to an entitlement to relief." Doe v. Baum, 903 F.3d 575, 581 (6th Cir. 2018) (internal citations omitted). "While the complaint 'does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions'" or "'a formulaic recitation of a cause of action's elements[.]'" Ryan v. Blackwell, 979 F.3d 519, 524 (6th Cir. 2020) (quoting Twombly, 550 U.S. at 555). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555 (internal citation omitted).

*ii. Pleading Requirements for Fraud Claims*

When claims sound in fraud, the plaintiff must comply with the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) by "stat[ing] with particularity the circumstances constituting fraud or mistake." Fed. Rule Civ. P. 9(b). "To satisfy Rule 9(b), a [] complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc., 29 F.4th 802, 810 (6th Cir. 2022) (citations and quotation marks omitted). "Rule 9(b)'s particularity requirement does not mute the general principles set out in Rule 8; rather, the two rules must be read in harmony." Sanderson v. HCA-The Healthcare Co., 447 F.3d 873, 876 (6th Cir. 2006) (citation and quotation marks omitted). "On the other hand, a district court need not accept claims that consist of no more than mere assertions and unsupported or unsupportable conclusions." Id. (citation omitted).

Additionally, when the complaint alleges securities fraud, it must also comply with the pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). See Louisiana Sch. Employees' Ret. Sys. v. Ernst & Young, LLP, 622 F.3d 471, 478 (6th Cir. 2010).

18

The PSLRA "requires plaintiffs to 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" Astec Indus., Inc., 29 F.4th at 810 (quoting 15 U.S.C. § 78u-4(b)(1)). In short, to survive the heightened pleading requirements of Rule 9(b) and the PSLRA, a securities fraud complaint must "allege the who, what, where, when, and why of the fraudulent statements." Id. (citation and quotation marks omitted).

Moreover, the PSLRA "imposes additional and more [e]xacting pleading requirements for pleading scienter." Ernst & Young, LLP, 622 F.3d at 478 (citation and quotation marks omitted). Thus, a private securities fraud plaintiff "shall, with respect to each act or omission alleged . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2)(A), which is at least recklessness (i.e., "highly unreasonable conduct which is an extreme departure from the standards of ordinary care," Doshi v. Gen. Cable Corp., 823 F.3d 1032, 1039 (6th Cir. 2016) (citations and quotation marks omitted)). The strong inference of scienter "'must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" Astec Indus., Inc., 29 F.4th at 812 (quoting Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 314 (2007)).

In assessing whether a plaintiff has adequately pled the strong inference of scienter, the courts employ a three-part test:

> First, we must accept all factual allegations in the complaint as true. Next, we review the allegations holistically to determine whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter. Finally, we must take into account plausible opposing inferences and decide whether a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

19

Id. (citations and quotation marks omitted). Additionally, the Court considers the following non-exhaustive list of so-called "Helwig" factors:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

Doshi, 823 F.3d at 1039–40 (quoting Helwig v. Vencor, Inc., 251 F.3d 540, 552 (6th Cir. 2001), abrogated on other grounds by Tellabs, 551 U.S. at 314).

**B.     Analysis**

Plaintiffs' failure to satisfy the heightened pleading requirements under Rule 9(b) and the PSLRA is dispositive. Sgherzi and Minty correctly argue that Plaintiffs' claims must be dismissed because they do not specifically allege that Sgherzi or Minty caused Plaintiffs injuries and they fail to meet the heightened pleading standards applicable to fraud claims. (Doc. No. 55 at 1–2). Likewise, Ianello correctly argues that Plaintiffs do not sufficiently allege wrongdoing on his part and do not specifically allege that he made misrepresentations or was involved with PCC when the alleged misrepresentations were made. (Doc. No. 51 at 1–2; Doc. No. 52 at 3).

*i. Securities Fraud Claims*

Plaintiffs do not specify what provision of the Exchange Act they bring their claims under, but it appears they are making claims under Section 10(b) and corresponding Rule 10b-5. (See, e.g., Doc. No. 45 at 2 (referencing 17 C.F.R. § 240.10b-5)). "Section 10(b) prohibits violating any rule or regulation prescribed by the Securities and Exchange Commission 'as necessary or

20

appropriate in the public interest or for the protection of investors.'" <u>Astec Indus., Inc.</u>, 29 F.4th at 809–10 (quoting 15 U.S.C. § 78j(b)). "In accordance with this provision, the Commission has issued Rule 10b-5, which prohibits untrue statements of material fact, omissions of material fact, and any other kind of fraud in connection with the purchase or sale of a security." <u>Id.</u> at 810 (citing 17 C.F.R. § 240.10b-5). "To state a securities fraud claim under Section 10(b), a plaintiff must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury." <u>Ashland, Inc. v. Oppenheimer & Co.</u>, 648 F.3d 461, 468 (6th Cir. 2011) (citation and quotation marks omitted). Rule 9(b) and the PSLRA's heightened pleading requirements apply to the first element, a misstatement or omission. <u>Astec Indus., Inc.</u>, 29 F.4th at 810.

The Complaint falls far short of the specificity required to answer these questions: "Who said the statement? What is the statement? Where did they say it? When did they say it? Why is it misleading?" <u>Id.</u> (citations omitted). Plaintiffs make many vague allegations in the passive voice without identifying the speakers of alleged statements. For example, they claim that "It was represented that each investment position would be paid a share of profits . . . ." (Doc. No. 45 at 12), and, "Even though nests were merely collections of tokens, they were falsely portrayed as representing shares in total revenue," (<u>id.</u>). Similar language is rampant throughout the Complaint. Plaintiffs occasionally identify the speaker of alleged statements, but where they do, they often leave out other crucial details. For example, the Complaint states that "Ianello insisted that [PCC] investments would 'eventually' yield profits." (<u>Id.</u> at 10). Yet, the Complaint does not identify what words he used or when or where Ianello said that. Similarly, Plaintiffs list many statements that they rely on to establish their securities fraud claim—and while they explain that each alleged

21

statement was a false misrepresentation, they do not identify any of the alleged speakers or when and where the misrepresentations were made. (Id. at 13, 22–23). Therefore, because "the [C]omplaint does not answer [the who, what, where, when, and why], it fails to sufficiently plead securities fraud" as required by Rule 9(b) and the PSLRA. Astec Indus., Inc., 29 F.4th at 810 (citations omitted).

Likewise, the Complaint does not adequately plead a strong inference of scienter. The Complaint simply makes repeated conclusory allegations that Defendant made false representations "intentionally and knowingly." (See, e.g., Doc. No. 45 at 25). That does not "state with particularity facts giving rise to a strong inference that [Defendants] acted with the required state of mind," much less do so "with respect to each act or omission alleged." Astec Indus., Inc., 29 F.4th at 812 (citations and quotation marks omitted).

Therefore, Plaintiffs' securities fraud claims must be dismissed.

*ii. RICO Claims*

Spence and Megibben's remaining RICO claims fail for largely the same reasons—they are not pleaded with sufficient particularity.

Section 1962(c) of RICO states:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962. The elements of a Section 1962(c) violation are "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Heinrich v. Waiting Angels Adoption Servs., Inc., 668 F.3d 393, 404 (6th Cir. 2012) (citation and quotation marks omitted). The fourth element, racketeering activity, is dispositive here.

22

"Racketeering activity consists of acts which are indictable under a number of federal statutes listed in 18 U.S.C. § 1961(1)(B)." Id. at 404. The Complaint is not entirely consistent or clear in alleging predicate acts of racketeering activity. For example, under the heading for Count II: [RICO], the Complaint alleges various predicate acts, "including but not limited to counterfeiting, interstate and foreign travel or transportation in aid of racketeering enterprises, money laundering, and wire fraud, as defined under 18 U.S.C. §§ 1341 and 1343." (Doc. No. 45 ¶ 126). Under the separate "Predicate Acts" subheading, however, it only states that Defendants engaged in "multiple acts of wire fraud." (Id. ¶ 131). And the response to the motion to dismiss further muddies the waters, mentioning only money laundering and wire fraud. (Doc. No. at 2, 9, 13). To the best of the Court's understanding, in light of this lack of clarity, it appears that the alleged predicate acts are wire fraud (under 18 U.S.C. § 1343) and money laundering (under 18 U.S.C §1956).

Starting with wire fraud, the elements are: "(1) a scheme to defraud, and (2) use of the [wires] in furtherance of the scheme." Heinrich, 668 F.3d at 404 (citation and quotation marks omitted). "A scheme to defraud includes any plan or course of action by which someone uses false, deceptive, or fraudulent pretenses, representations, or promises to deprive someone else of money." Id. (citation and quotation marks omitted). "A plaintiff must also demonstrate scienter to establish a scheme to defraud, which is satisfied by showing the defendant acted either with a specific intent to defraud or with recklessness with respect to potentially misleading information." Id. (citation omitted). Additionally, plaintiffs pleading wire fraud as a predicate act are required to meet Rule 9(b)'s heightened requirements. Id. at 405.

Next, to make out a money laundering claim, Spence and Megibben must show, *inter alia*, that Defendants engaged in a financial transaction involving proceeds from illegal activity. See

Williams v. Duke Energy Int'l, Inc., 681 F.3d 788, 802 (6th Cir. 2012) (citing 18 U.S.C. § 1956(a)(1)). Plaintiffs argue that Defendants laundered money, presumably from their investments, by transferring it to Belize. (Doc. No. 67 at 13). Thus, the alleged illegal activity that resulted in proceeds was some form of fraud (i.e., the alleged fraud underlying Plaintiffs' investments). As such, Spence and Megibben again must satisfy the heightened pleading requirements of Rule 9(b).

For the same reasons already cited as to the securities claims, Spence and Megibben also fail to plead the who, what, when, where, and why required by Rule 9(b) to make out wire fraud or money laundering. "RICO pleadings are to be liberally construed. However, under Rule 12(b)(6), as presently construed, the court does not accept legal conclusions unsupported by the pleaded facts." Fremont Reorganizing Corp. v. Duke, 811 F. Supp. 2d 1323, 1336 (E.D. Mich. 2011) (citing Begala v. PNC Bank, 214 F.3d 776, 781 (6th Cir. 2000); Lillard v. Shelby Cnty. Bd. of Educ., 76 F.3d 716, 726 (6th Cir. 1996)); see also id. at 1337 (citation and quotation marks omitted) ("Where a plaintiff makes only loose references to mailings and telephone calls to support its allegations of [] wire fraud, but otherwise fails to identify the parties to these transactions, circuit courts have upheld the dismissal of the RICO claims under both Rule 9(b) and RICO itself.").

Consequently, even if the Court has personal jurisdiction over Minty, Sgherzi, and Ianello with respect to Spence and Megibben's RICO claims, those claims would fail for the same reasons the Exchange Act claims fail. Therefore, the remaining RICO claims must be dismissed, and the Court need not address Sgherzi and Minty's arguments that dismissal is required under Rule 12(b)(1) for lack of standing.

## VI. State Law Claims

Having concluded that all of Plaintiffs federal claims fail either for lack or personal jurisdiction or failure to state a claim, only the state law claims for fraud and deceit and conversion remain. "Under 28 U.S.C. § 1367(c)(3), the district court may decline to exercise supplemental jurisdiction over a claim if it has dismissed all claims over which it has original jurisdiction. If the federal claims are dismissed before trial, the state claims generally should be dismissed as well." Brooks v. Rothe, 577 F.3d 701, 709 (6th Cir. 2009). Therefore, the Court declines to exercise supplemental jurisdiction over the state law claims.

## V. CONCLUSION

For the foregoing reasons, the motions to dismiss (Doc. Nos. 51, 55) are granted. An appropriate order will be entered.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE

25